CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ERICA CHOI (Bar No. 302351)
(E-Mail: erica_choi@fd.org)
SHANNON COIT (Bar No. 298694)
(E-Mail: shannon_coit@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
ASHLEIGH BROWN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:25-CR-780-SVW-2 |
| Plaintiff, | |
| v. | **DEFENDANT ASHLEIGH BROWN'S REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT** |
| ASHLEIGH BROWN, | |
| Defendant. | **Hearing Requested: January 26, 2026, at 11:00 a.m.** |

Defendant Ashleigh Brown, by and through her counsel Deputy Federal Public Defenders Erica Choi and Shannon Coit, submits this reply in support of her Motion to Dismiss the Indictment.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 16, 2025          By  */s/ Erica Choi*

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

# TABLE OF CONTENTS

Page

1   I. INTRODUCTION ........................................................................... 1

2   II. ARGUMENT ................................................................................ 3

3       A.   The Government's Abandonment of the § 119 Charge and its "Crime of Violence" Theory, and its Belated Attempt to Narrow the Scope of the Conspiracy Charge, Raise Serious Questions About the Integrity of the Grand Jury Process ............................................................... 3

6       B.   The Indictment Fails to Allege Essential Elements of the Offense ............ 4

7           1.   The Indictment Does Not Allege that Officer Huitzilin's Address Was Not Already Publicly Available ................................. 4

9           2.   The Indictment Does Not Allege that Ms. Brown *Knew* Officer Huitzilin's Address Was Not Publicly Available .............................. 8

11       C.   Section 119(a) Facially Violates the First Amendment ............................ 10

12           1.   The Government Ignores Cases Striking Down Very Similar State Statutes ............................................................ 10

14           2.   The Government's Attempt to Narrow § 119 Cannot Save it From Unconstitutionality ................................................. 13

16               a.   Intent to Threaten ................................................. 14

17               b.   Intent to Intimidate ................................................. 15

18               c.   Intent to Incite or Facilitate a Crime of Violence ................. 15

19       D.   Section 119 is an Unconstitutional Content-Based Restriction on Speech ................................................................... 16

21       E.   Section 119 Is Unconstitutional As Applied to Ms. Brown ...................... 18

22   III. CONCLUSION ............................................................................ 20

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Am. Farm Bureau Fed'n v. EPA*,
836 F.3d 963 (8th Cir. 2016) ................................................................. 6

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) .................................................................. 13, 16

*Brayshaw v. City of Tallahassee*,
709 F. Supp. 2d 1244 (N.D. Fla. 2010) .............................................. *passim*

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......................................................................... *passim*

*Dep't of Defense v. FLRA*,
510 U.S. 487 (1994) ................................................................................ 6

*Kaetz v. United States*,
2022 WL 1486774 (3d Cir. May 11, 2022) (per curiam) ........................... 5

*Kennedy v. Braidwood Mgmt.*,
606 U.S. 748 (2025) ............................................................................... 8

*Kocontes v. Orange Cnty. Sheriff's Dep't*,
2020 WL 9071688 (C.D. Cal. Dec. 30, 2020) ........................................ 16

*Landmark Comms., Inc. v. Virginia*,
435 U.S. 829 (1978) ............................................................................... 8

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ............................................................................... 7

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ................................................................................ 8

*Phila. Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986) ............................................................................... 5

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................................. 17

*Rehaif v. United States*,
588 U.S. 225 (2019) ............................................................................... 9

# TABLE OF AUTHORITIES

Page(s)

*Sheehan v. Gregoire*,
   272 F. Supp. 2d 1135 (W.D. Wash. 2003) ........................................................*passim*

*United States v. Hansen*,
   599 U.S. 762 (2023) ....................................................................................... 16

*United States v. Qazi*,
   975 F.3d 989 (9th Cir. 2020) ........................................................................ 10

*United States v. Santos*,
   553 U.S. 507 (2008) ......................................................................................... 7

*Virginia v. Black*,
   538 U.S. 343 (2003) ....................................................................................... 11

**Federal Constitution & Statutes**

U.S. Const. amend. I ...........................................................................................*passim*

5 U.S.C. § 552 ........................................................................................................ 6

18 U.S.C. 115 ................................................................................................... 8, 14

18 U.S.C. § 119 ...............................................................................................*passim*

**Other Authorities**

*Make*, Merriam-Webster Online (2025) https://www.merriam-
   webster.com/dictionary/make (last visited January 16, 2025) ..................... 5

# I. INTRODUCTION

The government's brief only underscores the flaws in this prosecution. The government has moved to dismiss the substantive § 119 charge after belatedly conceding that nobody ever shared Officer Huitzilin's[1] home address—and thus the supposed crime was never committed. And it has affirmatively abandoned its theory that the defendants intended to incite or facilitate the commission of a crime of violence, apparently after recognizing that the indictment fails to allege it. But the government still tries to salvage its claim that the defendants *conspired* to violate § 119—in other words, that they engaged in a conspiracy to speak.[2]

Immediately, that should raise red flags. Our Constitution does not permit the criminalization of speech except in the narrowest of circumstances, and it certainly does not permit punishment for merely thinking about speech. The government's brief makes clear that it seeks to convict the defendants for "conspiring" to read aloud publicly visible (and otherwise publicly available) house numbers—numbers they could see from a public street. That chilling admission should be enough to make clear that this prosecution has no place in our judicial system.

The government's contrary arguments lack merit. As the motion explained, the ordinary meaning of the statutory phrase "make restricted personal information publicly available" is to *cause* the information to enter the public domain. The government offers no other definition of the operative verb "make," nor does it identify any circumstance in which it would be conceivable to say that someone *made* information publicly available when it was already available to the public. Instead, it tries to rewrite

---

[1] The government's brief clarifies that the officer has changed his last name to Huitzilin. Opp. 2 n.2. The reply therefore refers to him as such.

[2] The government notified defense counsel on today's date (January 16, 2026) that it obtained and intends to file a superseding indictment. Count One of the superseding indictment continues to allege a conspiracy to commit § 119. As such, the arguments here and in the principal Motion to Dismiss apply equally to Count One of the superseding indictment.

the statute and resorts to policy arguments at war with the statutory text. But it is Congress's language that controls. Because the indictment does not allege that Officer Huitzilin's address was not already public (or that Ms. Brown knew as much), the indictment must be dismissed.

The indictment also must be dismissed because § 119 is both facially overbroad and unconstitutional as applied to Ms. Brown. The government attempts to save the statute by limiting its scope to true threats of violence. But the government misunderstands the test for true threats: to be a true threat, the speech *itself* must convey a threat. Section 119 is overbroad because it lacks this requirement. The government's claim that the threat requirement can instead be supplied by the statute's *mens rea* element (*e.g.*, an "intent to threaten") is contrary to decades of First Amendment law and cannot save the facially unconstitutional statute. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) ("The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end.").

The government says no court has found § 119 unconstitutional. Opp. 2. But it leaves out that no court has found the statute *constitutional*, either. Until recently, the government rarely charged individuals under § 119, leaving little occasion for constitutional challenges. But now that the government has decided to deploy the statute, this Court must address the arguments before it.

And the Court is not writing on a clean slate. Courts addressing similar state statutes have found that they violate the First Amendment. The government cites no case holding otherwise. Because the indictment fails to allege essential elements of the offense, and is unconstitutional both on its face and as applied to Ms. Brown, the Court should dismiss it.[3]

_____

[3] The government argues the principal Motion to Dismiss was untimely. Opp. 9 n.3. Not so. The motion was filed 28 days prior to the January 27, 2026, date in the Order Continuing Trial Date (ECF No. 68, p. 2). Even if untimely, the government has suffered no prejudice. It had sufficient time to respond, and filed an opposition on January 12, 2026. This reply is filed 10 days (not the required 7 days) in advance of the January 26, 2026, hearing date.

## II. ARGUMENT

**A.  The Government's Abandonment of the § 119 Charge and its "Crime of Violence" Theory, and its Belated Attempt to Narrow the Scope of the Conspiracy Charge, Raise Serious Questions About the Integrity of the Grand Jury Process**

The government moved to dismiss the substantive § 119 charge after belatedly conceding that nobody ever shared Officer Huitzilin's address. Opp. 4 n.4. And after Ms. Brown's motion pointed out that the indictment failed to allege which "crime of violence" she allegedly intended to incite or facilitate, Mot. 19-21, the government has abandoned that theory too, Opp. 10-11. What is left is the government's attempt to save its remaining theories by reading § 119 narrowly so that it extends only to true threats under First Amendment jurisprudence.

The Court should hold the government to its concessions. But they raise serious concerns about the grand jury process and how it produced an indictment defective in so many respects.

For example, the government now admits that the indictment contains at least one false allegation: that Ms. Brown "publicly disclosed . . . R.H.'s personal address." ECF 22 at 3; *see also id.* at 4 (alleging that Ms. Brown "made publicly available . . . the home address of R.H."); *see* Opp. 4 n.4. But it fails to explain how this factually wrong claim made it into the indictment. Did the government falsely tell the grand jury that Ms. Brown discussed Officer Huitzilin's home address? Did it incorrectly tell the grand jury that Ms. Brown did *not* *need* to discuss the actual address? The government is silent on this point.

There are similar problems with the indictment's allegations that Ms. Brown intended to incite or facilitate the commission of a crime of violence. *See* ECF 22 at 4. The government does not say whether it explained the concept of a "crime of violence" to the grand jury, whether it presented specific offenses that actually qualify as crimes of violence (rather than others, such as generic assault on a federal officer, which do

3

not, *see* Mot. 20), or whether it invited the grand jury to return an indictment on a theory that Ms. Brown intended to incite violence in the abstract, without any nexus to a specific *crime* of violence. The government provides no explanation, but its decision to abandon this theory suggests that it lacks confidence in whether it was properly presented to the grand jury.

In addition—and of serious concern for the government's remaining theories—the government never says whether the grand jury was instructed on the standard for "true threats" or incitement under the *Brandenburg* test. The government now concedes that § 119 could only be constitutional if limited to these narrow categories. Thus, the grand jury needed to find probable cause that Ms. Brown conspired to make a *true* threat of violence or engage in *Brandenburg* incitement, not just to "threaten," "intimidate," or "incite" as lay jurors might ordinarily understand those terms. But the government does not say whether the grand jury was ever instructed on these points.

A failure to give that instruction would be fatal to the indictment. A failure to properly instruct the grand jury on the applicable law, and the knowing presentation of false testimony, would support dismissal of the indictment. Ms. Brown seeks grand jury materials related to these issues, and concurrently files a Motion to Compel Grand Jury Materials.

**B.    The Indictment Fails to Allege Essential Elements of the Offense**

    **1.    The Indictment Does Not Allege that Officer Huitzilin's Address Was Not Already Publicly Available**

Section 119 makes it a crime to "knowingly make[] restricted personal information publicly available." 18 U.S.C. § 119(a). Because Congress chose the verb "make" to delineate the criminal act, the meaning of "make" sets the limits of the statute. As Ms. Brown's motion explained, ordinary usage, dictionary definitions, and common sense all show that to *make* information publicly available means to *cause* it to become publicly available. Mot. 5-7. One cannot "make public" what is *already* public.

4

*See, e.g.*, *Make*, Merriam-Webster Online (2025) ("to cause to happen," "to cause to be or become").[4]

The government's brief ignores the statutory text and Ms. Brown's discussion of it. Nowhere does the government attempt to provide its own definition of "make." It cites no dictionaries or examples of ways the word is used in ordinary speech. And it certainly does not offer a definition of the phrase "make restricted personal information publicly available" that would encompass information already in the public domain.

Instead, the government tries to rewrite the statute entirely. It starts with a claim that the phrase "make publicly available" is "synonymous" with "publicize." Opp. 8. But that "definition" does not come from a dictionary or any other authoritative source. Rather, it is plucked from an unpublished Third Circuit case that merely said in passing that § 119 applies to "publicizing restricted information" without ever addressing whether the information can already be in the public domain—something that was not at issue in that case. *See Kaetz v. United States*, 2022 WL 1486774, at *1 (3d Cir. May 11, 2022) (per curiam). The statute, however, says "make"—not "publicize." The Court must construe the actual text, and it is clear from the wording Congress chose—"make . . . publicly available"—that the defendant must be the one to cause the information to become public.

Next, the government argues that § 119 is "analogous" to defamation law. Opp. 8. The claim is difficult to understand. Defamation deals with *false* statements— in that context, truth is an absolute defense. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 770 (1986). But Section 119 applies to the dissemination of *truthful* information. The government does not explain why it believes the two are related, and there is no obvious connection between them. Indeed, it is not even clear from the government's brief which principles of defamation law it thinks apply to § 119.

---

[4] https://www.merriam-webster.com/dictionary/make (last visited January 16, 2025).

The government also relies on cases interpreting Exemption 6 of the Freedom of Information Act (FOIA). *See* Opp. 8 (citing *Dep't of Defense v. FLRA*, 510 U.S. 487 (1994); *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 972 (8th Cir. 2016)). But FOIA has nothing to do with § 119. Exemption 6 of FOIA prohibits the disclosure of "personnel and medical files and similar files" when doing so "would constitute a clearly unwarranted invasion of personal privacy." *See id.*; 5 U.S.C. § 552(b)(6). This language has nothing in common with the text of § 119 and thus sheds no light on the meaning of that very different statute.

The analysis required by Exemption 6 also differs significantly from anything conceivably required by § 119. Courts applying Exemption 6 must balance "the individual's right to privacy against the preservation of the basic purpose of FOIA." *Dep't of Defense*, 510 U.S. at 496. And "anything greater than a *de minimis* privacy interest" can justify applying the exemption. *Am. Farm Bureau*, 936 F.3d at 970. Given that low bar, the different statutory wording, and the entirely different context (disclosure of medical or personnel files held by the government, as compared to attempting to censor the speech of private individuals), it is unsurprising that Exemption 6 can sometimes be applied to publicly available information, while § 119 cannot.

The government's other arguments likewise lack merit. The government claims that if Congress wanted to restrict § 119 to information not already in the public domain, it would have used the phrase "make publicly available *for the first time*." Opp. 7. But that concept is already supplied by Congress's choice of the word "make." To "*make* information publicly available" necessarily means it was not previously publicly available. Consistent with that reading, the statute also uses the term "*restricted* personal information,"—language which similarly presupposes that the information is not freely available. The government's alternate version of the statute—to "make restricted personal information publicly available for the first time"—is an unnatural and redundant phrase that Congress had no reason to adopt.

6

Tellingly, the government does not identify any circumstance in which it would be reasonable—or even conceivable—to say that someone "made information publicly available" when that information was *already* public. By contrast, it is simple to come up with examples on the other side. A reader confronted with the sentence "Ben made the results of the study publicly available," would easily understand that Ben was the person who put the results into the public domain—not someone else, years earlier. At the very least, § 119 reasonably *can* be read this way, so the rule of lenity requires this Court to adopt that construction. *United States v. Santos*, 553 U.S. 507, 513 (2008).

With the language of the statute against it, the government resorts to policy arguments. Opp. 9-10. But "no amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021). This Court's role is not to weigh pros and cons but "to give the law's terms their ordinary meaning and, in that small way, ensure the federal government does not exceed its statutory license." *Id.* That role is particularly important in the criminal context, where individuals are entitled to statutory text that makes clear whether their conduct is lawful. *Santos*, 553 U.S. at 514 ("[N]o citizen should be held accountable for a violation of a statute whose commands are uncertain."). Because the text can be read as Ms. Brown reads it, this Court's inquiry should end.

At any rate, the government's policy arguments also fail on their own terms. The government focuses on potential harms to judges or jurors. *See* Opp. 10. But as is often the case, "there are (at least) two sides to the policy questions." *Niz-Chavez*, 593 U.S. at 171. Here, the government ignores an especially weighty countervailing interest: the First Amendment. Far from being "absurd," Opp. 10, it would be perfectly rationale for Congress to legislate carefully on a topic that obviously implicates free speech rights. Indeed, the government does not dispute that under its reading of § 119, it would be a federal crime to say nothing more than "The President lives at 1600 Pennsylvania Avenue," provided the speaker subjectively held the requisite intent. *See* Mot. 11 (raising this point); *see generally* Opp. (ignoring it). It is hard to believe that Congress

intended plainly unconstitutional results like this. *Kennedy v. Braidwood Mgmt.*, 606 U.S. 748, 775 (2025) ("We should not read the statute in a way that makes [it] unconstitutional if we can reasonably read it otherwise.").

One of the government's hypotheticals merits particular discussion, because it illustrates the extent to which the government has lost sight of the First Amendment interests at stake. The government laments that it would not be possible to prosecute someone under § 119 for sharing information that the daughter of a judge posted on a public Instagram account. Opp. 10. But sharing information found on social media is classic First Amendment-protected speech, whether that information came from a judge's daughter or anyone else. *See Packingham v. North Carolina*, 582 U.S. 98, 105 (2017). The government has not identified *any* case upholding a prohibition on sharing truthful information obtained through public sources. *Accord Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1142 (W.D. Wash. 2003). To the contrary, the First Amendment generally protects even the sharing of *confidential* information, at least as long as it was lawfully obtained.[5] *See Landmark Comms., Inc. v. Virginia*, 435 U.S. 829, 837-38 (1978).

Congress legislated against this settled backdrop. It reasonably chose language— "*make* restricted information publicly available"—that does not expose individuals to criminal prosecution for simply repeating information widely available in the public sphere.

### 2. The Indictment Does Not Allege that Ms. Brown *Knew* Officer Huitzilin's Address Was Not Publicly Available

As the motion explained, the indictment is also defective for a separate reason: it fails to allege that Ms. Brown *knew* Officer Huitzilin's address was not already publicly

---

[5] That does not mean the government could not prosecute someone who actually threatens a judge. As the motion explained, other statutes already cover this conduct. *See, e.g.*, 18 U.S.C. § 115(b) (threatening to assault a federal judge); Mot. 17 (discussing other statutes). But the First Amendment protects the sharing of publicly obtained, truthful information when unaccompanied by any true threat of violence.

available. Mot. 6. There is no dispute what the word "knowingly" modifies: the only phrase it could apply to is "makes restricted personal information . . . publicly available." 18 U.S.C. § 119(a). And, as explained, to "make" information publicly available means to cause it to enter the public domain. The statutory requirements are therefore straightforward: to "knowingly make restricted personal information publicly available," a person must *know* they are the one who has caused the information to become available to the public.

The government has no answer for the statutory text. So again, it tries to substitute a different word: "publish." Opp. 9. But "publish" appears nowhere in the statute. The Court should decline the government's invitation to rewrite the text, particularly since its rationale for doing so makes little sense. The government cites the Supreme Court's decision in *Rehaif*, Opp. 9, but that case addressed an entirely different type of issue: did the word "knowingly" apply only to the defendant's conduct (possessing a firearm) or also to his status as a felon? *See Rehaif v. United States*, 588 U.S. 225, 227 (2019). Here, there are no options. The only thing "knowingly" could modify is the phrase "make restricted personal information . . . publicly available." *See* 18 U.S.C. § 119(a). The plain meaning of that phrase requires that the defendant know they are putting the information into the public domain.[6]

\*      \*      \*

The government does not dispute that the indictment fails to allege that Officer Huitzilin's address was not already publicly available or that Ms. Brown knew as much. Its only argument is that § 119 does not contain these requirements. Because that

---

[6] In a footnote, the government advances a parade of horribles about supposed difficulties it might have in proving whether information was previously publicly available. Op. 10 n.11. But Officer Huitzilin's address was not hidden behind a paywall or on the "dark web"; it is available through simple Internet searches and from government records that any member of the public can easily access. *See* Exs. A, B, C, E-1 to Motion. Whether information could be deemed "publicly available" under § 119 if were impossible to find it through free simple searches is simply not at issue here.

9

1  argument is wrong, the indictment is missing essential elements. It therefore must be

2  dismissed. *United States v. Qazi*, 975 F.3d 989, 993 (9th Cir. 2020).

3  **C.    Section 119(a) Facially Violates the First Amendment**

4          Ms. Brown's motion explained that § 119 is unconstitutionally overbroad

5  because it criminalizes a substantial amount of speech protected by the First

6  Amendment. In an effort to save the statute, the government attempts to dramatically

7  narrow it, declaring—with little analysis—that § 119 is actually limited to "true

8  threats." Opp. 12.[7] As explained below, this is simply wrong. Speech can be a true

9  threat only when the *statement itself* threatens violence. The government's claim that

10  the speaker's subjective intent can strip otherwise protected speech of First Amendment

11  protections is contrary to decades of settled law.

12          As the motion detailed, courts addressing similar statutes have reached exactly

13  this conclusion: a statute banning the sharing of a home address *cannot* meet the

14  stringent true threats test—regardless of the speaker's intent. *Sheehan v. Gregoire*, 272

15  F. Supp. 2d 1135 (W.D. Wash. 2003); *Brayshaw v. City of Tallahassee*, 709 F. Supp.

16  2d 1244 (N.D. Fla. 2010). The government ignores these decisions, but they are well-

17  reasoned and correct. Because § 119 is not limited to true threats, the statute facially

18  violates the First Amendment.

19          **1.    The Government Ignores Cases Striking Down Very Similar State**

20                  **Statutes**

21          The government cites no case upholding a law anything like § 119. And it largely

22  ignores the well-reasoned decisions cited in Ms. Brown's motion that considered—and

23  struck down—very similar state statutes.

24

25

26  ───────────────

27          [7] The government also discusses the *Brandenburg* incitement test. Op. 12-14. The discussion is confusing because earlier in its brief, the government affirmatively disclaims that it will seek to rely on an incitement theory at trial. *See* Opp. 10-11, But in

28  any event, as explained below, the statute criminalizes speech that goes well beyond incitement under *Brandenburg*.

10

These statutes, like § 119, criminalized sharing the home address of a police officer with, *inter alia*, an "intent to intimidate." In *Sheehan*, the court considered a Washington statute that read:

> A person . . . shall not, **with the intent to harm or intimidate**, sell, trade, give, publish, distribute, or otherwise release the residential address, residential telephone number, birthdate, or social security number of any law enforcement-related, corrections officer-related, or court-related employee or volunteer . . . and categorize them as such, without the express written permission of the employee or volunteer unless specifically exempted by law or court order.

272 F. Supp. 22d at 1139 (emphasis added). And in *Brayshaw*, the court considered a similar Florida statute:

> Any person who shall maliciously, with intent to obstruct the due execution of the law or **with the intent to intimidate**, hinder, or interrupt any law enforcement officer in the legal performance of his or her duties, publish or disseminate the residence address or telephone number of any law enforcement officer while designating the officer as such, without authorization of the agency which employs the officer, shall be guilty of a misdemeanor . . . .

709 F. Supp. 2d at 1247 (emphasis added). Both decisions held that the statutes violated the First Amendment. *Brayshaw*, 709 F. Supp. 2d at 1248-50; *Sheehan*, 272 F. Supp. 2d at 1140-50.

As they explained, the Constitution protects the sharing of truthful lawfully obtained information. *Sheehan*, 272 F. Supp. 2d at 1142; *Brayshaw*, 709 F. Supp. 2d at 1249. To fall within the narrow category of "true threats," the *speech itself* must inherently "signal . . . impending violence." *Sheehan*, 272  F. Supp. 2d at 1243; *see Brayshaw*, 709 F. Supp. 2d at 1248. And simply sharing a home address does not satisfy this test. Unlike the cross-burning at issue in *Virginia v. Black*, 538 U.S. 343 (2003), "publishing personal information of police officers does not have a 'long and pernicious history as a signal of impending violence' that would allow [the Court] to regard it as a 'true threat.'" *Brayshaw*, 709 F. Supp. 2d at 1248; *see Sheehan*, 272 F.

11

Supp. 2d at 1143. To the contrary, "[s]imply publishing an officer's phone number, address, and email address is not in itself a threat or serious expression of an intent to commit an unlawful act of violence." *Brayshaw*, 709 F. Supp. 2d at 1248.

*Sheehan* and *Brayshaw* also squarely rejected the government's main argument here: that § 119's intent element—an "intent to threaten, intimidate, or incite the commission of a crime of violence"—can transform otherwise non-threatening speech into a true threat. As they explained, "a true threat does not turn on the subjective intent of the speaker." *Sheehan*, 272 F. Supp. 2d at 1141. So "[m]erely publishing an officer's address and phone number, even with intent to intimidate, is not a 'true threat' as defined in constitutional law jurisprudence." *Brayshaw*, 709 F. Supp. 2d at 1248.

*Sheehan* and *Brayshaw* addressed the same arguments at issue here. Yet the government's brief largely ignores them. It does not even mention *Sheehan*. And it devotes only a few sentences to *Brayshaw* that assert—with little explanation—that the statute there "prohibited a range of conduct far afield from the recognized First Amendment exceptions" supposedly applicable here. Opp. 15. That is simply not true. The statute in *Brayshaw* purported to criminalize exactly the same act as § 119— disseminating an officer's home address—with exactly the same intent: "the intent to intimidate." *Brayshaw*, 709 F. Supp. 2d at 1247. Indeed, *Brayshaw* explicitly rejected the exact theory the government advances here: that publishing an officer's address with the intent to intimidate is a "true threat" that can be criminalized under the First Amendment. *Id.* at 1248; *compare* Opp. 13. The government does not address this holding, much less attempt to explain why it is wrong.

The reality is that the government has no answer to *Sheehan* and *Brayshaw*. Those decisions methodically and persuasively explained why the mere act of sharing information that is not inherently threatening, like a home address, cannot be constitutionally punished—regardless of the speaker's intent. No court has held otherwise. The reasoning of those decisions is persuasive and dictates that § 119 is unconstitutionally overbroad.

12

**2.      The Government's Attempt to Narrow § 119 Cannot Save it From Unconstitutionality**

In effort to save § 119 from unconstitutionality, the government attempts to interpret it so that it only covers "true threats" and other unprotected speech. The government reaches this conclusion with little analysis. *See* Opp. 12. It recites the test for each category of speech and then simply declares that § 119 fits these categories perfectly, with no overbreadth. Opp. 12-14.

But the government has missed a fundamental point. True threats, incitement, and the like require that the *speech itself*—the *actus reus* of the crime—fit into those categories of unprotected speech. *Sheehan*, 272 F. Supp. 2d at 1243. As the Supreme Court recently put it, "[t]he existence of a threat depends not on the 'mental state of the author' but on 'what the statement conveys' to the person on the other end." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)). Of course, true threats *also* require a *mens rea* element: that the speaker "consciously disregard a substantial risk that his communications would be viewed as threatening violence." *Id.* at 69. But the *mens rea* element alone cannot transform otherwise protected speech into a true threat. *Id.* at 74.

Incitement is governed by the same principle. "[I]ncitement inheres in particular words used in particular contexts." *Id.* at 79. And it too, has an additional *mens rea* element: "the First Amendment precludes punishment . . . unless the speaker's words were 'intended' . . . to produce imminent disorder." *Id.* But although that *mens rea* requirement is necessary, it is not alone sufficient. The *speech itself* must also be "likely to incite or produce [lawless] action." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

This bedrock First Amendment law dooms the government's argument. The government focuses on the statutory terms "threaten, intimidate, incite, and facilitate the commission of a crime." Opp. 12. But critically, these terms appear only in § 119's ***mens rea*** provisions. *See* 18 U.S.C. § 119(a)(1)-(2) ("with intent to . . . "). The *actus*

13

*reus* element—which describes the speech actually being prohibited—can be satisfied by simply "mak[ing] restricted personal information . . . publicly available," with no further requirements.

For § 119 to be constitutional, the requirement of a threat or incitement would have to be included among the *actus reus* elements. For example, a statute that criminalized making personal information available "in a threatening manner" or "in a manner likely to incite lawless action" might be on sounder constitutional footing. But § 119 is missing these elements. It purports to criminalize a type of speech that is not inherently threatening based solely on the speaker's internal subjective intent, without requiring that any threat or incitement actually *be communicated*. *But see Counterman*, 600 U.S. at 74 ("The existence of a threat depends not on the 'mental state of the author' but on 'what the statement *conveys* . . . .'" (emphasis added)).

Without language cabining the *actus reus* elements of § 119 to only unprotected speech, each of the prongs of the statute captures a substantial amount of protected speech and is thus constitutionally overbroad.

### a.    Intent to Threaten

As discussed, for speech to constitute a "true threat" it must both *actually convey* a threat of violence (*actus reus*) and be delivered with at least conscious disregard that it will be viewed as threatening (*mens rea*). *Counterman*, 600 U.S. at 69, 74. The requirement that a threat be actually conveyed is why nearly all threats statutes explicitly criminalize the *act* of making a threat. *See, e.g.*, 18 U.S.C. 115(a)(1)(B) (making it a crime to "threaten to assault, kidnap, or murder" a federal official, judge, or law enforcement officer).

Section 119 works far differently. The criminal act there is not making a threat, but sharing personal information. Critically, the statute does not require that any threat be actually conveyed—it is enough that the speaker *internally* intend to threaten, even if no threat is ever communicated. *See* 18 U.S.C. § 119(a). Nor is there any implicit threat requirement. As *Sheehan* and *Brayshaw* correctly held, the mere act of sharing

14

1  the home address of a public official is not inherently threatening, because it "does not

2  have a 'long and pernicious history as a signal of impending violence." *Brayshaw*, 709

3  F. Supp. 2d at 1248; *accord Sheehan*, 272 F. Supp. 2d at 1143 ("[T]he speech at issue

4  here is merely names, addresses and numbers."). And sharing an address is the only act

5  that § 119 requires.

6      Because the reach of § 119 extends well beyond actual true threats, the statute is

7  unconstitutionally overbroad.

8                          **b.    Intent to Intimidate**

9      The intent to intimidate prong of § 119 suffers from the same flaws. The

10  government claims that the word "intimidate" should be construed to mean a true threat

11  of violence. Opp. 13. But even if that were correct, the statute would still not pass

12  muster. For the same reasons discussed with respect to the intent to threaten, § 119 does

13  not require that any threat actually be made, and instead covers the sharing of

14  information that is not inherently threatening, as long as the speaker has a subjective

15  intent to intimidate that the statute does not require be conveyed. This goes well beyond

16  the category of true threats. *Counterman*, 600 U.S. at 69, 74; *Brayshaw*, 709 F. Supp.

17  2d at 1248; *accord Sheehan*, 272 F. Supp. 2d at 1143.

18      But this prong suffers from another flaw: the phrase "with the intent to

19  intimidate" is unconstitutionally vague. Mot. 13. As *Sheehan* found, the word

20  "intimidate" lacks clarity and invites subjective or discriminatory enforcement. 272 F.

21  Supp. 2d at 1149. It is therefore void for vagueness.

22                 **c.    Intent to Incite or Facilitate a Crime of Violence**

23      In one part of its brief, the government claims that issues related to the "incite"

24  and "facilitate" prongs of the statute are "moot" because the government does not

25  intend to pursue those theories at trial. Opp. 11. But in another part of the brief, the

26  government devotes several pages to whether the "incite" and "facilitate" prongs

27  violate the First Amendment. Opp. 13-15. Given the government's commitment to not

28  proceeding on an incitement or facilitation theory—which this Court should enforce—it

is unclear why the government thinks these prongs of the statute remain at issue. But regardless, the government's arguments on this point lack merit.

As discussed above, to qualify as "incitement" under *Brandenburg*, the *speech itself* must be "likely to incite or produce [lawless] action." *Brandenburg*, 395 U.S. at 448. Section 119 is facially overbroad because it does not contain this requirement. Just as sharing a police officer's home address is not inherently threatening, *Brayshaw*, 709 F. Supp. 2d at 1248; *accord Sheehan*, 272 F. Supp. 2d at 1143, it is also not inherently inciting. As the motion illustrated, the statutory text could easily capture protected speech ("The President lives at 1600 Pennsylvania Avenue") as long as the speaker *subjectively hoped* to inspire someone to commit a crime—even if they did not outwardly advocate for imminent lawless action. Mot. 11. The statute therefore goes beyond what *Brandenburg* permits.

The "facilitate" prong suffers from the same problems. At the risk of being repetitive, the statute does not require actual facilitation, only an *intent* to facilitate. It is therefore far different from the statute at issue in *United States v. Hansen*, 599 U.S. 762 (2023), where the criminal acts themselves—"encouraging" and "inducing" illegal immigration—were forms of facilitation. Once again, a person's subjective intent alone cannot transform protected speech into unprotected speech. *Counterman*, 600 U.S. at 74. Because § 119 turns on precisely that distinction, it is unconstitutional on its face.

## D. Section 119 is an Unconstitutional Content-Based Restriction on Speech

The motion explained at length why § 119 creates content-based restrictions that cannot satisfy strict scrutiny. The government does not dispute (and has thus conceded) that § 119 could not satisfy strict scrutiny if required to do so. *See* Opp. 15-16; *Kocontes v. Orange Cnty. Sheriff's Dep't*, 2020 WL 9071688, at *3 (C.D. Cal. Dec. 30, 2020) ("[A]rguments to which no response is supplied are deemed conceded."). Its only argument is that strict scrutiny does not apply because the statute does not discriminate based on content. Opp. 15-16

16

The government is wrong. It cites the Supreme Court's reasoning in *Black* that it would not constitute content discrimination for Congress to criminalize "only those threats of violence that are directed against the President." Opp. 15-16 (citing *Black*, 583 U.S. at 362). But *Sheehan* considered and persuasively rejected this exact argument. As *Sheehan* explained, a statute can remain content-neutral if it distinguishes not on content, but on the intended recipient of the speech. 272 F. Supp. 2d at 1146 ("A statute is content-neutral when it regulates constitutionally proscribable modes of speech *directed at* certain individuals."). But a statute *is* content-based—and thus subject to strict scrutiny—when it regulates "statements . . . *about* certain individuals," but not others. *Id.* (emphasis removed in part). Applying this rule, *Sheehan* correctly held that a statute similar to § 119 created content-based restrictions: it prohibited the disclosure of information about law enforcement officers but not City Hall employees. *Id.* The same reasoning applies here. Section 119 enacts content-based restrictions because it prohibits the disclosure of information about federal law enforcement officers, but not state law enforcement officers or ordinary citizens.

And doctrine aside, the events underlying this case illustrate clearly that § 119 draws content-based lines. The government does not dispute that it was permissible for Ms. Brown to describe on a livestream nearly everything she could publicly observe: the name of Officer Huitzilin's street, the actions of the people present, and even the home addresses of Officer Huitzilin's neighbors. In the government's view, there was only *one* thing Ms. Brown could observe that she was prohibited from speaking aloud: the address of Officer Huitzilin himself. This is textbook content discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed . . . .").

Because § 119 draws content-based restrictions, it must satisfy strict scrutiny. *Id.* at 164. And because the government concedes through silence that it cannot do so, the statute is facially unconstitutional.

17

**E.    Section 119 Is Unconstitutional As Applied to Ms. Brown**

Because § 119 is facially overbroad, Ms. Brown need not show that it would be unconstitutional as applied to her. *See* Mot. 8 (discussing First Amendment overbreadth). But she can make that showing anyway. Indeed, her as-applied challenge has only grown stronger now that the government has dropped the § 119 charge, abandoned its incitement and facilitation theories, and admitted that the allegation that she shared Officer Huitzilin's address is false.

Given the government's concession that § 119 can only be constitutionally applied to true threats of violence, it is hard to conceptualize how it could allege (much less prove) a conspiracy to commit that offense. The government would have to allege that the defendants specifically agreed not just to follow Officer Huitzilin, but to threaten him. It would have to also allege that the threat they agreed to make was specifically a threat of *violence*. *See Counterman*, 600 U.S. at 74. And because the true threats analysis turns on both the content of the speech and how it is conveyed, *id.*, the government would have to allege that the defendants *agreed in advance* on both wording and a style of delivery that would take their statements out of the realm of protected speech. To charge anything less would violate the First Amendment.

Needless to say, threats of violence are not usually the product of a brainstorming session. It has hard to see how the government could ever expect to prove such a conspiracy, particularly in cases, like this one, where no threat of violence was ever made. But purposes of this motion, it is enough to say that the indictment here comes nowhere close to alleging a constitutionally prosecutable conspiracy.

Most obviously, in listing the objects of the conspiracy, the indictment *never alleges* that the defendants agreed to make a true threat of violence. The closest it comes is alleging that defendants encouraged *others* to come to Officer Huitzilin's address to threaten him. ECF 22 (¶B.2.c) ("Defendants would *encourage viewers* of their posts . . . to follow the federal agent to his or her personal residence, in order to threaten, intimidate, and incite the commission of a crime of violence against that

18

federal agent." (emphasis added)). But that allegation sounds in the facilitation theory that the government's brief has affirmatively abandoned. *See* Opp. 10-11. It is thus not relevant to whether the indictment adequately alleges the true threats theory that remains in the case. *See* Opp. 10-11 (abandoning incitement and facilitation theories); Opp. 13 (equating intimidation with true threats)

Because the government has now confirmed that it intends to proceed only on a "true threats" theory, the indictment must adequately allege that theory. But nowhere in the indictment does it allege that an object of the conspiracy was for the defendants to make true threats *themselves*. Instead, the three specific objects it alleges are either not violations of § 119 or involve theories that are no longer part of this case:

(a) Following Officer Huitzilin to his residence (not a violation of § 119)

(b) Disclosing the address of Officer Huitzilin on social media (not a violation of § 119, because mere disclosure of an address does not constitute a true threat of violence)

(c) Encouraging others to go to Officer Huitzilin's house (a facilitation theory the government has now abandoned)

ECF 22 at 2. Because the indictment fails to allege the sole theory the government intends to present at trial, it must be dismissed.

And just as problematic, the allegations that *are* in the indictment make clear that the actions of Ms. Brown and the other defendants were fully protected by the First Amendment. According to the indictment, they live streamed their drive through public streets, narrated what they observed, and encouraged others to come to their location— core First Amendment protected speech.[8] ECF 22 at 3. None of the overt acts alleged in

---

[8] The government complains that the Court's analysis must be limited to the facts alleged *in* the indictment. But it then lists many "facts" of its own that are found nowhere in the indictment. *E.g.*, Opp. 2 (asserting, among other things, that Officer Huitzilin lived in Baldwin Park, a 15-mile and 20-minute drive from the federal building; that Officer Huitzilin "realized he was being followed," "tried to lose the car that was trailing him," and told his wife that "they needed to leave their home as soon

19

the indictment suggest that they intended to make any threat of *violence*—much less, a threat *to* Officer Huitzilin, who was not the audience for the stream. Because the indictment fails to allege conduct that is not protected by the First Amendment, the indictment must be dismissed.

### III.CONCLUSION

For the foregoing reasons and those presented in her motion, Ms. Brown respectfully requests the Court dismiss the indictment in its entirety.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: January 16, 2025    By  */s/ Erica Choi*

ERICA CHOI
SHANNON COIT
Deputy Federal Public Defenders
Attorney for ASHLEIGH BROWN

---

as possible; and various details about defendants' supposed confrontation with him). Ms. Brown agrees that the Court should look only at the face of the indictment. But this is a problem for the government, not for her. Because the indictment does not allege that she or the other defendants intended, much less conspired, to make true threats of violence, the indictment fails to allege the only theory remaining in the case.