TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney &
Chief, Criminal Division
LAUREN E. BORDER (Cal. Bar No. 327770)
Assistant United States Attorney
Transnational Organized Crime Section
CLIFFORD D. MPARE (Cal. Bar No. 337818)
Assistant United States Attorney
Major Crimes Section
        1400/1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-8231/4962
        Facsimile: (213) 894-0141
        E-mail:    lauren.border@usdoj.gov
                   clifford.mpare@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                 v.<br><br>ASHLEIGH BROWN,<br>   aka "ice_out_ofla,"<br>   aka "corn_maiden_design,"<br><br>            Defendant. | No. 2:25-cr-00780-SVW-2<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ASHLEIGH BROWN<br><br>Hearing Date: July 20, 2026<br>Hearing Time: 11:00 a.m.<br>Location:    Courtroom of the<br>             Hon. Stephen V.<br>             Wilson |

        Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Lauren E. Border and Clifford D. Mpare, hereby files its sentencing position for defendant Ashleigh Brown.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.  The government respectfully requests the right to supplement this sentencing position with further information as needed.

Dated: July 6, 2026                    Respectfully submitted,

                                       TODD BLANCHE
                                       Acting Attorney General

                                       BILAL A. ESSAYLI
                                       First Assistant United States Attorney

                                       JENNIFER L. WAIER
                                       Chief Assistant United States Attorney
                                       & Chief, Criminal Division


                                              /s/
                                       LAUREN E. BORDER
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

On August 28, 2025, Cynthia Raygoza, Ashleigh Brown, and Sandra Samame followed an ICE agent (R.H.) several miles from his workplace to his home, screamed at him in front of his wife and young children while wearing masks and all black, and live-streamed their address to hundreds, if not thousands, of social media followers, prompting additional strangers to appear outside R.H.'s home later that day.  A grand jury indicted Raygoza, Brown, and Samame for conspiracy to publicly disclose the restricted information of an ICE officer (Count One) in violation of 18 U.S.C. §§ 371, 119 and stalking an ICE officer (Count Two) in violation of 18 U.S.C. § 2261A.  (Dkt. 103.) On February 27, 2026, after a three-day jury trial, the jury returned a verdict of guilty for Raygoza and Brown with respect to the stalking count, acquitted Raygoza and Brown of the conspiracy charge, and acquitted defendant Samame of both charges.

On April 27, 2026 and May 4, 2026, the United States Probation and Pretrial Services Office ("Probation") filed its Presentence Report ("PSR") and Recommendation Letter for defendants Raygoza and Brown, respectively.  (Dkts. 224-225, 228-229.)  For both defendants, Probation calculated a total offense level of 22 and a criminal history category of I, for a Sentencing Guidelines range of 41 to 51 months' imprisonment.  (Dkt. 225 ("Raygoza PSR") at 3; Dkt. 229 ("Brown PSR") at 3.)  Probation recommended the Court sentence Raygoza and Brown to 36 months' imprisonment (a two-level variance below the Guidelines range), followed by a two-year term of supervised release, and order defendants to each pay the mandatory

$100 special assessment.  (Dkt. 224 ("Raygoza Recommendation Letter"); Dkt. 228 ("Brown Recommendation Letter").)

The government agrees with Probation's calculations and sentencing recommendation.  A 36-month sentence is sufficient but no greater than necessary to accomplish the goals of 18 U.S.C. § 3553(a).

## II.   STATEMENT OF FACTS

### A.   Evidence at Trial

At trial, the evidence showed that on August 28, 2025, defendants – while dressed in black and concealing their faces with black masks – followed R.H. in his vehicle from a federal building in downtown Los Angeles to his personal residence.  (Brown PSR ¶ 13.) R.H., an ICE officer who focuses on removing sex offenders from the country, was heading home to his family for an outing that included a surprise for his sons, ages three and seven. (Id.)  The defendants livestreamed on their Instagram accounts their pursuit of R.H. in his government vehicle, and provided directions as they followed the victim home, encouraging their viewers to share the livestream. (Id.)

When R.H. arrived at his personal residence, he exited his government vehicle and got into the front passenger seat of his personal vehicle, where his wife (J.H.) was waiting with their two boys in the backseat.  (Brown PSR ¶ 14.)  R.H. and his family then noticed two masked females, later identified as Raygoza and Samame, approach R.H. in his personal car while recording with their phones. (Id.)  Defendants' black sedan was parked in a neighbor's driveway approximately 100 feet away from his home.  (Id.)  Standing by the

2

sedan was a third masked female, later identified as Brown, who was also recording on her phone. (Id.)

Defendant Raygoza shouted to bystanders while livestreaming on Instagram that their "neighbor is ICE," "la migra lives here," and "ICE lives on your street and you should know." (Brown PSR ¶ 15.) Brown yelled similar phrases, and Raygoza threatened to "pop" the victim. (Id.) Both J.H. and a concerned neighbor called 911 in response to defendants' actions. (Id.) The victim's two boys, who witnessed the incident, became distressed in the back of the car and are heard audibly crying on video. (Id.) Defendant Brown did not stop recording, even after J.H. asked her to stop because she didn't want her children recorded. (Id.)

Brown then publicly disclosed on Instagram an address approximately 100 feet from R.H.'s home and told followers, "there's the ICE agent – this is where he lives apparently," pointed out his car has no license plates, and stated, "come on down." (Brown PSR ¶ 39.) Seconds later, Brown refused to give her first name to a Baldwin Park police officer because she was livestreaming, asserting that to reveal such information online to her followers would be "uncomfortable." (Brown PSR ¶ 40.) In response to Brown's livestream, four to five individuals – also wearing masks – appeared outside the victim's home. (Id.) These individuals berated Baldwin Park police officers who had responded to the scene. (Id.)

R.H. and his family feared for their lives and safety that day. (Brown PSR ¶ 18.) They weren't sure if defendants had weapons, or what harm the others who arrived in response to the livestream would do to their family. (Id.) They also spontaneously found the online footage of them (clearly showing their faces, neighborhood, personal

3

vehicle, tattoos, and so on), where certain Instagram users reposted Brown's live-streamed video with captions such as "this scumbag," and restated the neighborhood address. (Id.)

J.H. – whom the defendants repeatedly accosted and called a "white bitch" although she is Native American and Mexican – and children who witnessed the incident have suffered severe emotional distress. (Brown PSR ¶ 19.) Increased car traffic from onlookers in their neighborhood in the ensuing weeks caused the victim and his family to relocate to a different county 45 minutes away. (Id.) The forced move significantly disrupted the education of R.H.'s children: the victim's daughters now have to commute over an hour to school each way (whereas before they simply walked down the street), and the victim's 15-year-old-son has decided to be homeschooled rather than attend high school. (Id.) The victim's three-year-old son, who has been diagnosed with autism and witnessed the distressing incident on August 28, also lost several social and health care benefits that were tied to his former county. (Id.) As a result of the incident, J.H. is currently in therapy, has difficulty sleeping, and is often scared to leave the house. (Id.)

**B.   Additional Facts**

Based on the Court's rulings on the parties' motions in limine, the government was not permitted to introduce the following facts at trial:

- R.H. and his wife lost a son almost exactly one year before the incident occurred in this matter. (Brown PSR ¶ 41.) He had been approached and shot by a person wearing a black mask, so when defendants appeared in their neighborhood that day wearing masks, the family was particularly fearful. (Id.) The house they were forced to move from in Baldwin Park was one of their only remaining connections to their murdered son, as the family has associated the house

4

with several memories of him (e.g., they built a gazebo together in the backyard).  (Id.)

- While defendants believed R.H. was driving from downtown Los Angeles to an ICE enforcement action, he was actually going home to adopt a puppy with his boys to help them with the loss of their son.  (Brown PSR ¶ 42.)

- The individuals wearing masks who appeared outside R.H.'s house in response to the livestream told one Baldwin Park police officer to "gobble some dick, bitch," called him a "faggot," and also exclaimed: "Let's dox them!"  (Brown PSR ¶ 43.)

**III. PROBATION CORRECTLY CALCULATED THE TOTAL OFFENSE LEVEL AS 22**

Here, Probation correctly calculated the base offense level as 18 under USSG § 2A6.2.  Probation also correctly added a +6 official victim enhancement because defendant stalked R.H. precisely because he is an ICE employee.  See USSG § 3A1.2(b) (official victim enhancement appropriate where the victim is a government employee and the offense of conviction was motivated by such status).

Additionally, defendant is not eligible for an adjustment for her role in the offense: aiding and abetting each other, both defendants Raygoza and Brown followed R.H. home, confronted his wife, and broadcasted that R.H. worked for ICE to the neighborhood.  While Raygoza threatened to "pop" R.H., Brown live-streamed the neighborhood address twice, causing strangers to appear outside R.H.'s home later that day.  Neither defendant was substantially less culpable than the average participant in the criminal activity to warrant a mitigating role adjustment.

Thus, with a -2 adjustment for defendant's zero-point offender status, the total offense level is 22.  (Brown PSR ¶ 38.)

**IV.   GOVERNMENT'S RECOMMENDATION**

The Court must impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).  The Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  In addition, the Court should fashion a sentence that reflects the seriousness of the offense, promotes respect for the rule of law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from future crimes of the defendant, among other considerations.  18 U.S.C. § 3553(a)(2).

Probation's recommended 36-month sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A.   Nature and Circumstances of the Offense**

The Court must consider the nature, circumstances, and seriousness of the offense.  18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Defendant's harassment and live-streaming of the victims and their neighborhood on August 28, 2025 destroyed the lives of a family who was already suffering.  R.H. and his family moved from the home that was the last remaining memory of their deceased child.  They can no longer appear in public without fear for their safety and the safety of their children.  R.H.'s children continue to suffer from disruptions to their schooling, and from the lack of county resources to assist R.H.'s son with autism.  Probation's recommended 36-month sentence is therefore appropriate to punish defendant for the ongoing, concrete harm she has caused R.H. and his family.

**B.   History and Characteristics of the Defendant and Need to Promote Respect for the Law**

The Court must also consider the history and characteristics of the defendant.  18 U.S.C. § 3553(a)(1).  Despite her promising education and employment prospects, defendant nevertheless became involved in criminal activity.  Instead of finding productive ways to express political speech and help her community, defendant chose to display intentionally cruel behavior targeted towards one innocent family she had never met.

Although Brown does not have any prior criminal convictions, she has shown continued defiance towards the law.  She was previously arrested for assaulting a federal officer in this district (Case No. 2:25-cr-00701-FMO) and stalked R.H. while she was on bond for that case and ordered to stay away from federal law enforcement. Defendant has also shown a troubling pattern of non-compliance during her bond in this case, both by disabling computer monitoring software on her cellphone and testing positive for opiates.  (Brown PSR ¶¶ 8-10.)

A significant custodial sentence is thus warranted in light of defendant's characteristics and the need to promote respect for the law.

**C.   Need for Deterrence**

The need for specific and general deterrence is particularly important in this case.  See 18 U.S.C. § 3553(a)(2)(B) (the sentence imposed is required "to afford adequate deterrence to criminal conduct," which encompasses both specific and general deterrence). On the individual level, defendant has not accepted that she broke the law on August 28, 2025, as a jury of 12 of her peers unanimously

found.  Even when confronted with the severe harm she caused R.H. and his family, she continues to argue her actions were lawful.  See dkt. 213 (motion for acquittal).  The general public must also be deterred from committing similar crimes in the future that pose a threat to law enforcement and their families.  A three-year custodial sentence is thus appropriate to deter defendant and the greater community from such criminal conduct.

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 36 months' imprisonment, followed by two years of supervised release, and order defendant to pay the mandatory $100 special assessment.

8